District of Colorado Health and Human Services You saved time for rebuttal. When you come back for rebuttal, can you answer for me or for the panel? Even assuming that there was absolutely no probable cause and anybody would have known there was no probable cause, what case law is clearly established that that's a violation of constitutional rights for a doctor to do that? I'm not saying that it shouldn't be a violation of constitutional rights. I'm not implying anything. What case law says it is that was clearly established at that time? You're going to need to tell me the case. Yes, ma'am. Please, if you can. I will. Thank you. Good morning, Your Honors. My name is Eric Hudson. I represent Drs. Daniel Solomon or Dr. Parsa, Daniel Solomon and Michael Parsa. May it please the Court. There are several claims in this case. There are official capacity claims, individual capacity claims, state law tort claims, and claims concerning the discovery issues in the district court. Given the limited amount of time here, I want to focus my argument for the Court this morning on whether there's clearly established law that requires physicians to have independent probable cause when they act as an auxiliary to law enforcement. Let me ask you how. First, this is just a yes or no, or maybe I don't know is your answer, but is this the first time this has happened in El Paso, or is this a routine issue where somebody gets arrested on the bridge, gets stopped on the bridge, and it was an arrest, I guess, and taken, I mean technically, and taken to the hospital, and doctors then on request from the government do this kind of a search? I doubt, is this not the first time this has happened, is it? So the answer to your question is yes and no, based on my understanding. This case, as I understand the Jane Doe case, that case involved state actors, DPS, if I understand that case correctly. I'm not intimately familiar with that case. What makes that case different from the case that we have at hand is we're not dealing with state law enforcement, we're dealing with federal law enforcement. And part of the briefing in the district court below concerned the implications of the border search exception to the Fourth Amendment, which, as this court is aware, is not really an exception so much as the border excludes Fourth Amendment protections at the border and its functional equivalent. Whether there's been another case involving border patrol and the border search exception, I'm not aware of another case. If the Jane Doe case does involve that, I'm not intimately aware of the facts of that case, so I won't be able to answer this court's question. I'm not aware of any other circumstance aside from this particular case and the Jane Doe case that has occurred at this bridge involving Texas Tech. Mr. Hudson, is there case law that says that law enforcement can, I mean, that medical people can defer to law enforcement, or is there not such case law? Well, the case law that we cited in our briefing, Your Honor, was United States v. Velazquez, which was the Ninth Circuit case that involved border patrol taking a person to the hospital, asking physicians to actually conduct a search. Now, that was a criminal case, and that involved a motion to suppress, and the issue in that case was whether the physicians were allowed to conduct the search or whether they needed reasonable suspicion, just like border patrol. And the Ninth Circuit explicitly stated in that case, there's no reason why a physician who's acting as an auxiliary to law enforcement should have to articulate their own independent probable or reasonable suspicion before assisting law enforcement in evaluating whether a person's body packing. Specifically, the Ninth Circuit noted that not only did they not have to have that suspicion, but the Ninth Circuit also found that there were sufficient facts that, had the physicians wanted to establish a reasonable suspicion, they could have. Yet the Ninth Circuit did not take the extra step and require that physicians on a going-forward basis have their own reasonable suspicion before they assist law enforcement. And so based on that case, obviously that's Extra Circuit. That's, to my mind, the key case as it relates to the facts here. I'm not aware of any Fifth Circuit case or any United States Supreme Court case that requires a physician to develop their own reasonable suspicion when they're assisting perhaps maybe not law enforcement at the state level, but definitely not when they're assisting border patrol. Is reasonable suspicion a standard we're dealing with, or is it probable cause or some other standard? Well, I believe because we're dealing with the border patrol here, I believe we're dealing with the border search exception, which deals with reasonable suspicion. So this case would be something separate and apart. If the facts changed and we were dealing with, for instance, if DPS had brought this person in, this would be a different case altogether. But because we're dealing with border patrol, we're dealing with border patrol's standards and border patrol's reasonable suspicion requirements. The DPS case has been resolved without a legal determination. Is that correct? It's my understanding that that case was settled. That's what I'm— Yes, Your Honor. And after that case, if I understand the facts of that case, I believe this case came six months after that case happened. So is the DPS case the same as the Jane Doe case, or is that another case? I believe the Jane Doe case involved DPS, but again, Your Honor, I'm not familiar enough with the facts of that case to be able to— So you don't know whether it's the same as when you say the DPS case— well, one of you said the DPS case, and you all seemed to know which case you were talking about. I was talking about the Jane Doe case. Is that what you were talking about? I'm under the impression that the Jane Doe case involved DPS officers. Are you sure it's some other DPS case, or is that— No, I'm referring to the same case. Just to clarify for the panel. That helps me, because part of my problem is, counsel Opposite said, extraordinary in the pattern of what we found out. I guess I should ask him what the heck that meant, because if it's extraordinary, but then it's a pattern, then I guess it's not that extraordinary if there's a pattern. So I'm not sure what he meant. So now I'm getting really interested in how many cases there are like this. So anyway, go ahead. And so you're only aware of the two cases? I'm only aware of the Jane Doe case, and what I can do for the court, just so that I'm not misrepresenting something, I'll be glad to submit a 28-J letter, go back and take a look at the facts of Jane Doe to make sure that the court is aware, at a minimum, of who the law enforcement authority was in that case. Again, it's my understanding it's DPS, but I don't want this court to misapprehend that case. The qualified immunity issue in this case is dispositive. Because there are no cases that would otherwise guide or provide the fair notice to Dr. Solomon and Dr. Parsa, there's no reason why they would have thought to ask Border Patrol for warrants, for reasonable suspicion, for all of the things that they had done at the border to determine whether the doctors could assist them based on the reasonable suspicion that the Border Patrol agents had developed. Why wouldn't it be better to send it back for some sort of factual development on whether the Border Patrol told the doctors that they had suspicion? Well, Your Honor, I don't think that that would change the case. Even if the Border Patrol had told them we have reasonable suspicion,  even if they said we don't have reasonable suspicion, still do this thing, would it change the result on qualified immunity regardless? I think it would probably be a closer question, but I don't think it changes the qualified immunity analysis because there's no case that deals with any kind of spectrum of issues. While that would probably be a more egregious case and probably would give more pause to the panel, I don't think that that factual pattern would find any support in clearly established law any more than any other factual pattern that could be developed in this case. So remanding it back down to develop facts on that point won't change the law that's at issue. And for purposes of the qualified immunity analysis, the question is whether the law is clearly established, not whether there is a factual pattern that would— When you say whether the law is clearly established, I'm trying to figure out what law would you be talking about? What law is clearly established? Well, it's our position that the doctors were not required to develop any kind of independent reasonable suspicion before they acted as auxiliary to the doctor. So it's not your position that there doesn't need to be some reasonable suspicion? Well, what I would say about that, Your Honor, is that— So if I understand your question, to my mind, there's a difference between whether there's a constitutional violation and whether the law is clearly established in this case. And I don't think the court needs to reach the constitutional question to decide this case. Under Pearson, it's clear that this court can take in any order that it wants the question of whether there's a constitutional violation. Because the law is not clearly established in this area, that resolves the case without having to reach the constitutional issue. So it could be unconstitutional to do a search without reasonable suspicion, but even if it was, there's not case law on the second prong. That's correct, Your Honor. We believe that even if this court found a constitutional violation, we still win in this case because the law is not clearly established on what the doctors were supposed to do as it relates to any kind of constitutional violation that this panel could find. But we know we're talking about a search. Well, we don't disagree that there was a search. Because I think the Fourth Amendment might go. I think that's correct, Your Honor. All right. We don't disagree that the Fourth Amendment applies here. All right. But, again, because there's a clearly established law on how to apply the Fourth Amendment in this area, we don't believe that this court, A, should reach the issue, and, B, even if it does reach the issue, we believe that it's not clearly established how the physician should have handled that. One other question. Valazquez is the only case that you're aware of that's dealt with this at all in a circuit level, in any circuit? May I answer, Your Honor? Yes. That's the only case that I found that was as clearly on point as Valazquez. I'm not aware of any other case that addresses it. If I had found it, obviously, I would have presented it to the panel. With that, we ask that you affirm the decision of the district court, and thank you. May it please the Court. John Ross from Thompson Co. Cousins and Irons. I represent the hospital and the two ER nurses who happened to have been on duty the night the Border Patrol agent brought Mr. Steeles to the hospital. The two, what did you say? The two nurses. All right. ER nurses who were on duty. Can you also keep your voice up, sir? Yes, ma'am. Yes, Your Honor. Before I turn to my argument, I want to specifically address Judge Graves' question, and Mr. Hudson already touched on it. The specific language in Valazquez, which I think is directly on point here, says, We see no purpose in requiring customs agents to recite to examining physicians any of the facts which they have concerning the defendant's possession of narcotics. Since a physician is required to have no knowledge of the law of search and seizure to practice his profession, any such enumeration of the facts by the agents to the doctor would be a meaningless ritual comparable to requiring the police to recite to a locksmith the basis of their probable cause before he could legally open a lock for them. And that is the lead case. So for purposes of this motion, are you asking us to assume that the agents just instructed the doctors to conduct the searches? Are we to assume those facts? Should there be some discovery to develop those facts? Or are they immaterial, what the agents may have said to the doctors? I'm not asking the court to assume anything. All right. I think it's really important, given counsel's opening argument, to come back to procedurally where we're at before this court. This case is here on a Rule 12b-6 dismissal, and 90% of the argument you heard from opposing counsel is argument outside the scope of the pleadings relating to facts outside the scope of the pleadings. The question here is whether or not the district court properly dismissed this case under Rule 12. And that's the only issue. And the scope and the standard of review for that review is well established, as the court knows. With that, I'd like to turn separately to the district court's dismissal of the claims against the nurses versus those against the hospital. And with regard to that, I think it's also really important for the court to appreciate exactly what was alleged against the nurses and the hospital in the district court and what's been raised in the briefing before this court, because many of the arguments have been waived because they weren't addressed in the brief. With regard to the nurses, the district court purported to dismiss state court Texas Tort Claims Act claims against them. But if you read the complaint, there were no such claims even alleged against the nurses. They were only alleged against Texas Tech and the hospital. The only claims alleged against the nurses below were under 1983. Purportedly, the plaintiff sued them in their official and individual capacities for a violation of the Fourth and the Fifth Amendment. It's our position initially that the district court's dismissal with regard to those claims is waived. If you look at pages 22 through 25 of the appellant's brief, they don't even address the grounds on which the district court dismissed those claims. So that issue is waived, and on that basis alone the decision ought to be affirmed. But moving beyond the waiver issue to the substance and the correctness of the district court's decision, it was clearly proper for the district court to dismiss the 1983 claims against the nurses to the extent they were sued in their official capacity because under this court's precedent, Sanders v. City of Plano, those claims were redundant with the municipal claims against the hospital. So that was proper. With regard to the extent that the plaintiff sued the nurses individually, with regard to the Fourth Amendment claim, again, we largely concur with Mr. Hudson's argument that the plaintiff did not sufficiently plead, with regard to the nurses at least, that they violated any clearly established constitutional right. In fact, if you read the complaint, there is no specific act that either nurse is alleged to have done. There's a generic claim at the start of the complaint that they were sued in their individual and official capacity, and then there are all kinds of allegations about the doctors and the border patrol agents and the Jane Doe case, which, by the way, before I forget, that case was in federal court. So if the court wants to look at the pleadings in that case to learn the facts, I'm sure it's all available on PACER, and the citation for that is in the briefs. So the district court was correct in dismissing under Rule 12b-6 the 1983 claims against the nurses because there was nothing they were alleged to have done which violated a clearly established constitutional right. With regard to the Fifth Amendment claim, and this, again, is an issue not even addressed by the appellant before this court, the district court dismissed the Fifth Amendment claim under the Supreme Court's decision in Graham v. Conner, which says that before you look to whether or not there's a due process violation, you look first to see whether or not there's some more specific constitutional right that protects the claim that's being made, and in this case it's clearly the Fourth Amendment, so you don't even need to address the Fifth Amendment due process claim. On that ground alone, the district court was correct, and again, that issue's been waived because it hasn't been briefed in this court. Secondly, the district court was also correct in dismissing that claim because even if you look to the Fifth Amendment, you've still got to allege conscious, shocking behavior as a violation of that due process clause, and if you look at the amended complaint, there's not a thing alleged in there that the nurses did at all, and certainly nothing that rises to the level under Rule 12b-6. Again, that issue, too, has been waived. When you look at the brief in this case, it's largely, the appellant's brief is largely two things. One, it's a running series of complaints about a lack of discovery, which is irrelevant in considering a Rule 12b-6 motion. Well, and I asked you earlier whether or not that was immaterial, and you just told me we're here on a 12b-6, and so I guess that translated into that's immaterial, but I thought the district court found no constitutional violation because the district court said that the doctors and nurses reasonably relied on this suspicion articulated to them by the agents. That's not what the district court found, or it did, but it's just immaterial. The district court found that the plaintiff's pleadings insufficiently met the pleading standards under Rule 12b-6 to even allege that the nurses violated a clearly established contract. So it didn't have anything to do with anything articulated to them by the officers. The district court made no findings based on that. Absolutely not. All right. Absolutely not. The hospital itself. Let me address that real quickly. So there were municipal claims under 1983 against the hospital, and there was also the Texas Tort Claims Act claim. Once the district court properly dismissed the claims against the nurses, the 1983 claim against the hospital fell like a house of cards because unless, as this court has clearly established, unless there's an underlying constitutional violation, you can't have municipal liability, and the dismissal of the claims against the nurses necessarily means that, in fact, we believe that the hospital is entitled to summary judgment, not just a 12b-6, because the plaintiff couldn't establish that essential element of the claim against the hospital. With regard to the Texas Tort Act claim, and, again, there's a waiver on this because it hasn't been briefed, there was no jurisdiction. Our position below and removed under 12b-1 to dismiss, plaintiffs never gave the hospital the required statutory notice under the Texas Tort Claims Act, which is jurisdictional, and they made no argument to the contrary. The district court's dismissal on that ground was proper as well. We'd also ask that this court affirm the district court's dismissal under 12b-6 against both the hospital and the nurses. Thank you. Let me see if I can answer for you. There's a case cited in the brief Hood v. Phillips, as well as the Texas patent jury charge, that a doctor is required to have a consent form, and if he does not have a consent form, he commits a medical battery on the person, and it's cited. The Hood case has been around a very long time, and it's basically what Judge Graves is talking about, that you cannot just routinely rely on a law enforcement officer. Does the case say that a medical battery is a Fourth Amendment violation? Is it what violation, Judge? A Fourth Amendment violation. It may be a tort, but is it a Fourth Amendment violation? Ma'am, it says only that's a medical malpractice case. So you would have to then take the next level to the question of probable cause, and they keep citing Velazquez. Velazquez is a bad case for them to cite. If you read the case, you can see Mr. Velazquez is, one, a criminal case. Two, he had dilated pupils, needle marks on him. He had grease on his rectum. All of these raise the suspicion that he had some drug involvement. Mrs. Bastillos, who I'm sure the court recognized was not exactly a Girl Scout leader, however, it is also important to know when they did all this to her, they did not know who she was. They did this to her without knowing that she had a prior criminal history. Now, it had nothing to do with the case eventually, but that's one of the reasons they used later on. So back to Judge Elrod's question, there's a case, another criminal case called Sadler, which says you need more than reasonable suspicion to do a search of a body cavity. So what you have here is a 1983 classic constitutional right, back to exactly your determinations in Blackburn and Fandador, which how big a deal is this when you are subjecting someone to a vaginal and rectal search, which is what happened to Mrs. Bastillos. And I thought it was interesting that, you know, we were trying to get something going here as far as discovery, and they filed the 12B-6, and Mr. Ross is wrong. Judge Martinez said that this was reasonable but mistaken judgment. That's what he has in one of his dismissals, reasonable but mistaken. And as you all have in your precedents, what is reasonable? That's the question. The difficulty we had here was we couldn't find out what was reasonable. We couldn't find out what they did. We found out these other things. For example, they violated their own policy. We found that out in the other cases. We found that out in Jane Doe's case because we were absolutely precluded. And to give you an example, we were trying to find out the names of the agents who were the Border Patrol agents. The judge would not help us, and under the new rules, under the new modified Rules 26, the judge is supposed to get in there and try and help us. Mr. Ross replied to the judge when the judge said, did you file a Freedom of Information Act request for the names? Mr. Ross did, and it was denied. So at that point, that's when I told the judge we had filed the Federal Tort Claims Act, and that judge gave us the names of the people, and that's how we were able to proceed and go against the United States on that side of the case. But we got no help whatsoever from Judge Martinez in the district court. Everything we tried to do, we need discovery, denied. We need this, denied. We need a continuance, denied. Everything was denied, and then they sit and hold up the 12B and say you need to respond to this immunity claim. And how are we going to do that when we can't find out any facts? No facts. Did we know what the policy was? Do we know, for example, Judge Earl, can you, as a doctor, tell the Border Patrol person, go away, I'm not doing this. I have absolute evidence that there's nothing in this woman's bodily cavities. I'm not doing this. Can he do that? Yes, he can. And that's what's required under Texas law. You've got no consent, you've got no probable cause, you've got no suspicion, and you've got no warrant. And just so you all know, when we finished the case against the United States, one of the things we did was a 12-part repair of their policy that this doesn't happen again. They didn't even have the permission of the guy who was in charge of the port, the captain of the port. They had a regular supervisor at the bridge who authorized all of this. He wasn't authorized to do it. He wasn't authorized to tell the doctors anything. You need to wrap it up. Your time has expired, so you need to wrap it up. Okay. Well, Judge, the only thing I was going to tell you was that was part of the job that I thought we had, was to prevent this from happening again, and we have now in place, but we didn't have it in place before. And lastly, so I don't annoy everybody here, I asked the supervisor at the time, when I was able to do his deposition later on, I said, did this offend you in any way? And he said, no. And I said, okay. Thank you. We have your argument. This case is submitted. Thank you.